Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| MIGUEL ELÍAS GUTIÉRREZ CENTENO<br><br>Apelante<br><br>v.<br><br>PRESBYTERIAN COMMUNITY HOSPITAL, INC.<br><br>Apelado | KLAN202400818 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2022CV09730 (803)<br><br>Sobre: Despido Injustificado (Ley 80 y otros) |

Panel integrado por su presidenta, la Juez Brignoni Mártir, la Jueza Álvarez Esnard y la Jueza Prats Palerm

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 28 de octubre de 2024.

Comparece ante nos el señor Miguel Elías Gutiérrez Centeno ("señor Gutiérrez o "Apelante") mediante *Apelación* recibida el 5 de septiembre de 2024. Nos solicita que revoquemos la *Sentencia* dictada el 29 de agosto de 2024 y notificada el 30 de agosto del mismo año, por el Tribunal de Primera Instancia, Sala Superior de San Juan ("foro primario" o "foro *a quo*"). Mediante el aludido dictamen, el foro primario declaró *Ha Lugar* una solicitud de sentencia sumaria presentada por Presbyterian Community Hospital, Inc. ("Hospital" o "Apelado") y, en consecuencia, desestimó la reclamación de despido injustificado instada por el Apelante.

Por los fundamentos que expondremos a continuación, **confirmamos** la *Sentencia* apelada.

**I.**

El 2 de noviembre de 2022, el señor Gutiérrez presentó *Querella* sobre despido injustificado contra el Apelante mediante el procedimiento establecido en la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, Ley Núm. 2 de 17 de octubre de 1961, según enmendada (Ley Núm. 2), 32 LPRA sec. 3118 *et seq.*[1] Mediante esta, el Apelante alegó que comenzó a trabajar en el Hospital en mayo de 1998 como supervisor de sistema de información. Arguyó que, en varias instancias, le solicitó a su patrono adiestramientos sobre sistema de seguridad y políticas informativas, pero nunca los recibió. Adujo que, en agosto de 2022, un *hacker* tuvo acceso a un servidor informativo del Hospital. Indicó que, a consecuencia de este incidente, fue despedido de su empleo el 17 de octubre de 2022. Señaló que el despedido fue uno injustificado ya que no incurrió en ninguna conducta que justificara tal acción. Por ello, solicitó una indemnización por la suma de setenta y cuatro mil seiscientos noventa y dos dólares con veintiséis centavos ($74,692.26), más dieciocho mil seiscientos setenta y tres dólares con siete centavos ($18,673.07) en honorarios de abogados.

En respuesta, el 18 de noviembre de 2022, el Hospital presentó *Contestación a Querella y Solicitud de que se Convierta el Procedimiento en uno Ordinario.*[2] Mediante esta, argumentó que, durante el mes de agosto de 2020, el Hospital experimentó varios incidentes en el sistema de información que presentó un riesgo al mantenimiento y confidencialidad de la información protegida por la Ley HIPPA. Esgrimió que producto de estos incidentes, se llevó a cabo una investigación interna y, mediante esta, se demostró un reiterado incumplimiento por parte del señor Gutiérrez en sus deberes y funciones como Gerente de Sistema y Comunicación. De

---

[1] Véase, apéndice del recurso, págs. 1-3.
[2] *Íd.*, págs. 4-11.

igual manera, el Apelado solicitó en este escrito la conversión del procedimiento de uno sumario a ordinario.

Evaluada la solicitud presentada por el Hospital, el 21 de febrero de 2023, el foro primario emitió *Resolución*,[3] en la que determinó que no procedía la conversión del proceso a uno ordinario. No empecé a ello, permitió un amplio descubrimiento de prueba siempre y cuando no se afectaran los términos dispuestos en la Ley Núm. 2. Así pues, tras varias incidencias procesales, el 15 de diciembre de 2023 el Apelado presentó *Moción de Sentencia Sumaria*.[4] En esta, solicitó la desestimación total de la *Querella* por no existir hechos materiales que justificaran la causa de acción del señor Gutiérrez. De igual manera, sostuvo su contención con la siguiente prueba:

> Anejo 1: Deposición del Sr. Miguel E. Gutiérrez Centeno de 7 de junio de 2023.
>
> Anejo 2: Referido de empleado a Irma Carrillo, Directora de Recursos Humanos suscrito por Louriel Cruz, CIO de fecha 10 de octubre del 2022.
>
> Anejo 3: Transferencia de Conocimiento durante el manejo del proyecto de comunicación y seguridad de redes Miguel Gutiérrez a Amaury González, CEO, BINARITS Office de 10 de junio de 2022.
>
> Anejo 4: Carta de CP Corp., Tomás Valines, Manager Services Plataforms, CP Corp. Inc. A Louriel Cruz, CIO, de 27 de octubre de 2023. a. Adiestramiento a todo personal técnico de Ashford Hospital, Oficina de Informática de Nutanix. b. Hyper Cover Infrastructure y Rubrik Data Management de 5 de agosto de 2023, Adiestramiento Exclusivo al Sr. Miguel Gutiérrez vía Zoom Meeting de Rubrik Data Management.
>
> Anejo 5: Technical Support Center with IT Agenda of Training as to Nutanix, 23 de junio de 2022, 19 de junio de 2023 y 5 de agosto de 2023, con anejos.
>
> Anejo 6: Email de Tomás Valines a Rogelio Caballero, CIO, de 30 de septiembre de 2020 con copia a Giovani Velázquez. Passwords Policy con la implementación de complejidad de passwords para servidores y computadoras del Hospital.
>
> Anejo 7: Informe Final Actualizado del caso de Miguel Gutiérrez a Irma Carrillo Muñiz de Louriel Cruz, CIO, 17 de octubre de 2023.
>
> Anejo 8: Políticas de Contraseñas de 20 de junio de 2021.

---

[3] *Íd.*, pág. 12.
[4] *Íd.*, págs. 13-42.

Anejo 9: Solicitud de servicios de servidor para registro de tumores con el Departamento de Salud.

Anejo 10: Aviso de Sofo de ramsonware de 14 de agosto de 2022 al Ashford Hospital con recomendaciones a seguir por el Hospital.

Anejo 11: Forma de Incidente de Sistema de Información, tipo de incidente: Cyber Attack de 14 de agosto de 2022 a las 12:01 pm.

Anejo 12: Memo de Amaury González de Binarits al Ashford Hospital re: el ataque de 13 de agosto de 2022 de servicios nuevos Departamento de Sistemas de Información.

Anejo 13: Minuta de Cyber Attack de 23 de septiembre de 2022.

Anejo 14: Email a Louriel Cruz, Arnaldo Valladanes, 11 de octubre de 2022. Incidente 3M Remediation attestation affected by malware, referido a Miguel Gutiérrez el 10 de octubre de 2022, por 3M.

Anejo 15: Forma de incidente de sistema de información de ransomware en servidor 3M, 10 de octubre de 2022 a las 3:17 am.

Anejo 16: Email de Rogelio Caballero a todo IT para registración del sistema DUO de doble autenticación en los servidores de 13 de abril de 2021.

Anejo 17: Requisición para comprar material de equipo de Miguel Gutiérrez para Pentest, 19 de abril de 2022 para horas de servicios con GM para reparación de los hallazgos de Pentest firmado por Miguel Gutiérrez.

Anejo 18: Penetration Test Professional Services from GM, 19 de abril de 2022.

Anejo 19: Factura de Penetration test firmada por Miguel Gutiérrez de 4 de septiembre de 2021. Factura HIPP Security Risk Assessment de GM, firmada por M. Gutiérrez, 14 de noviembre de 2022.

Anejo 20: CP Corp., Inc., a Presbyterian Hospital Multifactor authentication for administration and premises, 8 de febrero de 2022.

Anejo 21: Requisición para contrato de servicios de monitoreo 24/7.

Anejo 22: CP Corp., Inc., Management Services Agreement.

Anejo 23: Contrato de Management Services Agreement, 22 Proposal de Binarits de 3 de julio de 2022, para añadir Second Sofo Firewall.

Anejo 24: Sofo Central System de 06-2021 al 06/2022.

Anejo 25: SIDIF de 10/16/2021 al 10/15/2022 con licencia y renovaciones.

Anejo 26: Reportes de Eduardo Murillo, Presby Report de 26 de agosto de 2020.

Anejo 27: Renovación Anual Antivirus, 12 de octubre de 2021, requisición. Anejo 28: Renovación de licencia anual de Sofo de 28 de abril de 2021.

Anejo 29: Contestación a interrogatorios de la parte querellada. Anejo 30: Declaración Jurada de Louriel Cruz

Oquendo, CIO. Anejo 31: Declaración Jurada de Irma Awilda Carrillo Muñiz.[5]

Conforme a la prueba antes detallada, el Apelado sostuvo que el señor Gutiérrez no identificó ni advirtió los intentos del *hacker* de entrar al servidor virtual. Destacó que el Apelante incurrió en nueve (9) violaciones al *Reglamento de Disciplina*, de las cuales, cinco (5) contenían como sanción el despido en primera ofensa. Por ende, concluyó que el despido del señor Gutiérrez fue justificado ya que surgía de una violación reiterada del *Reglamento de Disciplina el Ashford Presbyterian Community Hospital.*

Por su parte, el 28 de diciembre de 2023, el Apelante presentó *Moción en Oposición a Solicitud de Sentencia Sumaria.*[6] Mediante esta, señaló que el señor Gutiérrez no había tenido ninguna falta o acción disciplinaria en los veinticuatro (24) años que llevaba laborando en la empresa. Argumentó que el Apelado, en su moción de sentencia sumaria, demostró desconocimiento sobre los sistemas electrónicos del Hospital y sus múltiples deficiencias. Indicó que fue el propio Apelado quien creó el problema de seguridad de ataques, ya que tenía múltiples contratistas, lo que creó conflictos en el sistema. En ese sentido, razonó que existían varias controversias de hechos, las cuales incluían asuntos técnicos, que impedían la resolución de la presente controversia por la vía sumaria.

Por su parte, el 16 de enero de 2024, el Hospital presentó *Réplica a Moción en Oposición a Solicitud de Sentencia Sumaria.*[7] En síntesis, esbozó que el Apelante no controvirtió de manera real, sustancial y genuina los hechos propuestos por el Hospital. Agregó que, en viarias instancias, el Apelante negó los hechos sin una contradeclaración o evidencia admisible. Por su lado, el 23 de enero de 2024, el Apelante presentó *Duplica en Oposición a Solicitud de*

---

[5] *Íd.*, págs. 43-46.
[6] *Íd.*, págs. 560-578.
[7] *Íd.*, págs. 582-619.

*Sentencia Sumaria.*[8] En esta, reiteró que, en el caso de marras, existían hechos en controversias que impidieran que se dictara sentencia sumaria.

Evaluadas las posturas de las partes, el foro primario emitió *Sentencia* el 29 de agosto de 2024 y la notificó el 30 de agosto del mismo año.[9] Mediante esta, el foro *a quo* declaró *Ha Lugar* la sentencia sumaria y, por consiguiente, desestimó la *Querella* que dio origen a este caso. Asimismo, dictaminó que, si bien existían hechos en controversias, estos no eran hechos materiales que impedían determinar que el despido estuvo injustificado.

Inconforme con este resultado, el 5 de septiembre de 2024, el Apelante presentó el recurso de epígrafe y formuló el siguiente señalamiento de error:

> Erró el TPI al desestimar sumariamente, sin realizar determinaciones de hechos, la querella por despido injustificado bajo la Ley 80-1976, tratándose de un despido en primera ofensa, con numerosos hechos en controversia y que requieren dirimir la credibilidad de los testigos en juicio plenario.

El 9 de septiembre de 2024, emitimos *Resolución* en la que le concedimos un término de treinta (30) días a la parte Apelada para que expusiera su posición en torno al recurso. Oportunamente, el 15 de octubre de 2024, el Hospital presentó *Alegato en Oposición a la Apelación.* En esta reiteró que no había fundamento alguno para revocar la *Sentencia* apelada toda vez que la solicitud de sentencia sumaria incoada estuvo sustentada con prueba documental admisible que demostró que el despido del Apelante fue uno justificado.

Con el beneficio de la comparecencia de todas las partes, procedemos a exponer la normativa jurídica aplicable al caso de autos.

---

[8] *Íd.*, págs. 620-624.
[9] *Íd.*, págs. 625-629.

**II.**

***A. Sentencia Sumaria***

La sentencia sumaria es un mecanismo procesal cuyo propósito principal es facilitar la solución justa, rápida y económica de los litigios que no presentan controversias genuinas de hechos materiales y, por lo tanto, no ameritan la celebración de un juicio a fondo. *Birriel Colón v. Econo y otros,* 213 DPR ___ (2023), 2023 TSPR 120, resuelto el 3 de octubre de 2023, pág. 9; Véase, además, *Segarra Rivera v. Int'l Shipping et al.,* 208 DPR 964, 979 (2022). La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R.36, permite que, en un litigio, cualquiera de las partes le solicite al tribunal que se dicte sentencia sumaria a su favor, ya sea sobre la totalidad o cualquier parte de la reclamación solicitada. Reglas 36.1 y 36.2 de Procedimiento Civil, *supra.* No obstante, para que una sentencia sumaria proceda, es necesario que de los documentos que la acompañan, se demuestre que no existe una controversia real sobre los hechos y solo reste aplicar el derecho. *SLG Szendrey v. Consejo de Titulares,* 184 DPR 133, 138 (2011) citando Corp. Presiding Bishop CJC of LDS v. Purcell, 117 DPR 714, 720 (1986).

Para poder demostrar eficientemente la falta de controversia sobre hechos esenciales, el promovente de la sentencia sumaria debe: (1) exponer las alegaciones de las partes; y (2) desglosar en párrafos debidamente enumerados los hechos sobre los cuáles, a su entender, no hay controversia. Regla 36.3 de Procedimiento Civil, *supra,* R. 36.3.

En *Meléndez González et al. V. M. Cuebas,* 193 DPR 100 (2015), el Tribunal Supremo estableció "el estándar específico" que debe utilizar este Foro al "revisar denegatorias o concesiones de Mociones de Sentencia Sumaria". A esos efectos, el Tribunal dispuso que:

el Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679 (2018).

Es decir, planteada una revisión de sentencia sumaria, el Tribunal de Apelaciones está en la misma posición que el Tribunal de Primera Instancia para resolver, por lo que debe evaluar las mociones presentadas en el foro primario y cumplir con los requisitos dispuestos en la Regla 36 de Procedimiento Civil, *supra,* al emitir su dictamen. *Meléndez González et al. v. M. Cuebas, supra.* "[L]a revisión del foro apelativo conlleva examinar *de novo* el expediente de la manera más favorable hacia la parte que se opuso a la solicitud de sentencia sumaria en el tribunal de instancia y realizando todas las inferencias permisibles a su favor". *Birriel Colón v. Econo y otros, supra,* pág. 11, citando a *Meléndez González et al. v. M. Cuebas, supra.*

En ese sentido, en el ejercicio de nuestra función revisora, estamos limitados a: (1) considerar los documentos que se presentaron ante el foro primario; (2) determinar si existe o no controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó correctamente. *Cruz, López v. Casa Bella y otros*, 213 DPR ___ (2024), 2024 TSPR 47, resuelto el 8 de mayo de 2024, pág. 14.

Por otra parte, nuestra más Alta Curia ha definido el concepto hecho material de la siguiente forma: "[u]n hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el

derecho sustantivo aplicable *Ramos Pérez v. Univision*, 178 DPR 200, 213 (2010). De igual modo, la controversia de hecho que impida la resolución sumaria de un caso debe ser real. *Íd.* Es decir, debe ser "de una calidad suficiente como para que sea necesario que un juez la dirima a través de un juicio plenario". *Íd.* (citas omitidas).

### B. *Ley Sobre Despidos Injustificados*

La *Ley de Indemnización por Despido sin Justa Causa*, Ley Núm. 80 de 30 de mayo de 1976, según enmendada, ("Ley Núm. 80"), tiene como propósito proteger el derecho de los trabajadores ante las acciones arbitrarias y caprichosas de los patronos. *Segarra Rivera v. Int'l. Shipping et al.,* 208 DPR 964, 982-983 (2022). Por su carácter reparador, esta Ley debe ser interpretada de manera liberal y favorable al empleado. *Jusino et al.* v. *Walgreens*, 155 DPR 560, 571 (2001). El referido estatuto le impone el pago de indemnización conocida como la mesada al todo patrono que despida sin justa causa a un empleado. 29 LPRA sec. 185a. Para recibir dicha compensación, el empleado despedido debe cumplir con los siguientes requisitos: (1) ser un empleado contratado por tiempo indeterminado; (2) recibir una remuneración; y (3) ser despedido de su puesto sin justa causa. *Íd*; Véase, además, *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 929 (2015).

El despido del empleado ocurre cuando el patrono, de forma unilateral, rompe el contrato que celebró con el empleado. *Díaz* v. *Wyndham Hotel Corp.*, 155 DPR 364, 374 (2001). Ahora bien, no todo despido conlleva una reclamación por despido injustificado. A tales efectos, el Art. 2 de la Ley Núm. 80, *supra,* define "justa causa" para un despido como "[a]quella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono". 29 LPRA sec. 185b. También, se considerarán justa causa para el despido "[a]quellas razones que afecten el buen y normal funcionamiento de un establecimiento [...]". *Íd.* A su vez, el Art. 2 de

la precitada Ley establece ciertas circunstancias o actos que afectan el buen y normal funcionamiento de un establecimiento, sin que se entienda como una lista taxativa de circunstancias, a saber:

(a) Que el empleado incurra en un patrón de conducta impropia o desordenada.

(b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.

(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

(d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.

(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento. *Íd.*

Las primeras tres circunstancias son conductas específicamente concernientes al comportamiento del empleado, mientras que el resto responden al cierre, reorganización o reducción de la empresa. *Segarra Rivera v. Int'l. Shipping et al., supra,* pág. 984. Con relación a esto, la Ley Núm. 80, *supra,* dispone que "[n]o se considerará despido por justa causa aquel que se hace por mero capricho del patrono o **sin razón relacionada con el buen y normal funcionamiento del establecimiento**". 29 LPRA sec. 185b; Véase, además, *León Torres* v. *Rivera Lebrón,* 204 DPR 20, 51 (2020).

Ahora bien, al evaluar el aludido Artículo 2 de la Ley Núm. 80, el Tribunal Supremo de Puerto Rico ha expresado que "ante la dificultad que representa intentar establecer y enumerar en un estatuto todas las posibles situaciones que podrían justificar un despido, los tribunales tenemos la obligación de evaluar situaciones, no contenidas de forma expresa en la Ley 80, para determinar si medió, o no, justa causa para el despido de un trabajador". *Jusino et als. v. Walgreens, supra*, pág. 572. Por ende "el estatuto no prevé el universo de incidencias que puedan surgir en un entorno laboral y que desemboquen en la cesantía de un empleado". *Indulac v. Unión,* 207 DPR 279, 300 (2021).

Cónsono con lo anterior, le corresponde al patrono adoptar aquellas normas y reglamentos razonables que estime necesarios para el buen funcionamiento de la empresa. *Íd.* En ese sentido, el documento de la empresa que contenga las reglas del trabajo y establezca las normas, beneficios y los privilegios del empleado, forma parte del contrato de empleo. *Santiago v. Kodak Caribbean, LTD.,* 129 DPR 763, 775-776 (1992).

Ahora bien, para que las violaciones a las reglas o normas del empleo constituyan justa causa para el despido de una persona, el patrono debe demostrar lo siguiente: (1) las reglas establecidas para el funcionamiento del establecimiento son razonables; (2) le entregó copia de las normas al empleado; y (3) que el empleado las violó en reiteradas ocasiones. *Rivera Águila v. K-Mart de P.R.*, 123 DPR 599, 613-614 (1989).

A tono con lo antes discutido, la Ley Núm. 80, *supra*, no favorece el despido como sanción a la primera falta. *Indulac v. Unión, supra*. **No obstante, dicha regla no es absoluta**. *Íd.* Sobre el particular, el Tribunal Supremo ha resuelto que existen circunstancias en las que una sola ofensa o primera falta pudieran justificar un despido. *Íd.* No obstante, en esos casos particulares, la

falta que conlleve despido tiene que ser de tal seriedad o de naturaleza tan grave y lesiva a la paz, que resulte imprudente tener que esperar su reiteración para destituir al empleado. Íd., citando a *Srio. del Trabajo v. I.T.T.,* 108 DPR 536, 543-544 (1979). Es decir, la Ley Núm. 80, *supra*, permite que, "en caso de falta única por parte del empleado, el patrono le imponga como sanción el despido, siempre y cuando las circunstancias del caso no reflejen una decisión arbitraria o caprichosa". *Delgado Zayas v. Hosp. Int. Med. Avanzada*, 137 DPR 643, 650 (1994)

Finalmente, es preciso destacar que la Ley Núm. 80, *supra,* contiene un esquema probatorio mediante en el cual, una vez el empleado despedido demuestra que cumple con los requisitos para ejercer la causa de acción, será el patrono quien tendrá el peso de la prueba para establecer que el despido fue justificado. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 774-775 (2022).

**III.**

En el recurso de epígrafe, el señor Gutiérrez nos solicita que revoquemos una *Sentencia* dictada sumariamente por el foro primario el 29 de agosto de 2024. Plantea, como su único señalamiento de error, que el foro *a quo* incidió en haber desestimado sumariamente la *Querella* por despido injustificado sin haber realizado determinaciones de hechos. Por su parte, el Hospital sostiene que el despido del señor Gutiérrez estuvo justificado conforme la prueba presentada en su solicitud de sentencia sumaria. Veamos.

Dado a que se trata de la revisión de un dictamen resuelto por la vía sumaria, le corresponde a este foro revisor realizar un examen *de novo,* tanto de la solicitud de sentencia sumaria y sus anejos, así como su oposición. Efectuado el análisis correspondiente, resolvemos que ambas partes cumplieron

esencialmente con los requisitos dispuestos en la Regla 36 de Procedimiento Civil, *supra.*

Atendido lo anterior, nos corresponde determinar si existen hechos materiales en controversia y, de haberlos, exponer concretamente cuáles son. De igual forma, se esbozarán los hechos que estén incontrovertidos. Véase, *Roldán Flores v. M. Cuebas et al., supra.* Es preciso aclarar que, en el caso que nos ocupa, el foro primario invocó la doctrina establecida en *Pérez Vargas v. Office Depot,* 203 DPR 687 (2019) y, conforme a ello, no consignó determinaciones de hechos sobre los cuales no existe controversia. Conforme a esta jurisprudencia, el foro primario no viene obligado a realizar determinaciones sobre hechos incontrovertidos cuando se resuelve una solicitud de sentencia sumaria en su totalidad "dado que éstos son los que fueron propuestos por la parte promovente en su solicitud". *Íd.,* pág. 704.

Ahora bien, para poder cumplir nuestra encomienda de identificar si, en efecto, en el caso de marras existen hechos materiales en controversia, es necesario examinar los hechos propuestos por el Hospital en su solicitud de sentencia sumaria. A tenor con lo anterior, el Apelado propuso los siguientes hechos como incontrovertidos:

1. El Sr. Miguel Elías Gutiérrez Centeno comenzó a trabajar en mayo de 1998, como Supervisor del Sistema de Información.

2. Para esa posición el Sr. Gutiérrez Centeno suscribió una Descripción de Deberes que obra en su expediente de personal de Supervisor de Centro de Cómputos.

3. Desde junio de 2006 a 2016 ejerció como Coordinador de Redes y Sistemas. En la descripción de deberes los ítems entre 8 a la 13, como Coordinador de Redes y Sistemas era responsable del mantenimiento y administración de la red interna y externa del hospital y todos sus componentes, tiene que informar al Director del Departamento sobre el horario de los diferentes departamentos que afecten el uso de los equipos. Es responsable del mantenimiento y administración de todo el sistema hardware-software de IT para el apoyo a la operación y buen funcionamiento del Hospital y establecer y mantener

políticas y procedimientos de seguridad de administración.

4. Al momento del despido, éste se desempeñaba como Gerente de Sistemas y Comunicaciones, posición que se desempeñaba desde el año 2018. Esa posición tenía una Descripción de Deberes, la cual suscribió el 9 de marzo de 2020. En su descripción de deberes, este era responsable: (1) mantenimiento y administración de la red informática interna/externa del Hospital; (2) mantenimiento y administración de comunicaciones interna/externa del Hospital; (3) establecer y mantener políticas y procedimientos de seguridad y administración; (4) mantenimiento y administración de sistemas de apoyo a la operación del Hospital; (5) ofrecer sugerencias para mejorar la administración, seguridad y reducción de costos; (6) colaborar en el adiestramiento de personal de nuevo reclutamiento; (7) participar en las reuniones administrativas que se le solicitaran; entre otras descripciones de sus tareas la disponibilidad de trabajar horarios irregulares, feriados y/o fines de semana.

5. El 4 de agosto de 2022, al querellante se le remitió la descripción de sus deberes donde se le requirió marcar sus descripciones de deberes que entiende que él realiza y colocar sus iniciales y lo remitiera al Oficial Principal de Informática, la Sra. Louriel Cruz. El Sr. Miguel Elías Gutiérrez Centeno hizo lo instruido y añadió todas aquellas funciones adicionales que indicó que realizaba en aquel momento de su puño y letra en dicha descripción, tales como monitorear la red, instalar parches de seguridad a los servidores, manejo y mantenimiento del Active Directory, manejo de backup en servidores HP, manejo de consolas Nutanix, manejo de consola de ransomware, manejo de consola firewall de SOFO y manejo de la consola de emails o Silver Sky1.

6. Bajo su supervisión se encontraba Jean Lugo, Técnico de Field.

7. El Sr. Gutiérrez Centeno admitió que la función de CPCorp. es a tenor con un contrato que especifica todos los servicios que iban a rendir. Que dichos servicios requerían un ticket para que ellos realizarán esa labor.

8. El Sr. Gutiérrez Centeno admitió que dentro de las funciones como Gerente de Sistemas y Comunicaciones estaba la creación y supervisión de los servidores con el apoyo técnico.

9. El Sr. Gutiérrez Centeno admitió que parte de sus funciones, después de instalados los servidores era la supervisión, revisión, darle mantenimiento y repararlos.

10. Declaró que en la instalación de las aplicaciones de la protección del servidor se aplica el SOFO Central, que es para el monitorio de los antivirus. 1 Lo añadido por el Sr. Gutiérrez se relaciona a sus funciones de mantenimiento, manejo de equipo de seguridad y monitoreo de la red.

11. El Sr. Gutiérrez Centeno admitió que la persona que está creando el servidor es la persona que le designa el IP Address (IP).

12. El Sr. Gutiérrez Centeno admitió que es requisito crear un password o contraseña de administrador en el Hospital, que 5 personas tenían acceso para poder hacer los cambios de passwords.

13. El Sr. Gutiérrez Centeno declaró que éste tenía a cargo la supervisión y mantenimiento de 11 servidores y los demás lo tenía CPCorp. y que esa información estaba en el contrato.

14. El Sr. Gutiérrez Centeno admitió que estaba a cargo de las actualizaciones y supervisión del servidor 3M.

15. El Sr. Gutiérrez Centeno declaró que el servidor 3M es el único servidor que pertenecía a los servidores de producción y que estos cubrían todos los departamentos y zonas que están de producción. Dicho servidor era para la facturación, manejo de información de pacientes, codificación de la facturación del Hospital.

16. El Sr. Gutiérrez Centeno admitió que, si no se puede hacer la codificación de las cuentas de pacientes, esto implicaba pérdida para el Hospital porque no se puede cobrar o facturar.

17. El Sr. Gutiérrez Centeno admitió que era responsable del Active Directory y reconoció que tenía que cumplir con todas las políticas que estaban implementadas en el Hospital con respecto al Active Directory. La función del Active Directory es para vigilar quién está autorizado a utiliza la red informática.

18. El Sr. Gutiérrez Centeno admitió que los passwords del servidor del Active Directory no se escribe en el servidor.

19. El Sr. Gutiérrez Centeno admitió que él era el gerente responsable para velar el Active Directory.

20. El Sr. Gutiérrez Centeno admitió que el Hospital estableció un lugar para guardar los passwords críticos de departamento donde el Hospital adquirió un aplicativo Last Pass y que ahí tenía que guardarse las contraseñas en ese lugar.

21. El Sr. Gutiérrez Centeno admitió que tenía que velar que se guardaran las contraseñas en el Last Pass y era una función importantísima asignada de él, velar por el Active Directory.

22. El Sr. Gutiérrez declaró que el SOFO Central es el monitoreo de la red, y antivirus.

23. El Sr. Gutiérrez Centeno admitió que tenía tres (3) pantallas y una era dedicada al monitoreo del sistema por el SOFO Central, y que parte de sus funciones era monitorear las comunicaciones que estaban entrando al sistema.

24. El Sr. Gutiérrez Centeno admitió que cualquier problema técnico como un acceso, que se dañé un VPN o que algún usuario no pueda entrar, se hacía un ticket a los entes externos pero que el personal de IT del Hospital entraba a tratar de arreglarlo primero.

25. El Sr. Gutiérrez Centeno admitió que él era el responsable de asignar los IP address de los servidores y que se debe conocer la estructura de IP para poder asignarlos.

26. El Sr. Gutiérrez Centeno admitió que el responsable para restablecer y verificar que todos los servidores del Hospital tuvieran el autenticador DUO y que era responsable de supervisar que la aplicación del DUO estuviera instalado en los servidores y exigir la instalación de la aplicación.

27. El Sr. Gutiérrez Centeno admitió que el penetration test investiga toda vulnerabilidad de la red del Hospital en cualquier compañía que tenga una PC, switches, servidores, computadoras, printers y cámara de seguridad y el propósito es que sale una información y bajo esa información es que se ataca la vulnerabilidad de la compañía.

28. El Sr. Gutiérrez Centeno admitió que el pen-test revela las situaciones que había que corregir y que era su responsabilidad corregirlas.

29. El Sr. Gutiérrez Centeno admitió que comparó los resultados del pen-test y sus hallazgos.

30. La importancia para el Hospital de tener la información del penetration test era para que no se metiera un hacker porque se le hacía más difícil debido a las precauciones, pero si tiene equipos que no cumplen se va a meter.

31. El Sr. Gutiérrez Centeno admitió que si no cumplían con las instrucciones de autenticación de passwords se va a "meter" el hacker, también admitió qué si el equipo no cumple con el DUO o si el equipo no tenía la actualización DUO había que darle vigilancia y hacer los señalamientos de todos los equipos que no tenían DUO. Además, admitió que dentro del Departamento IT el sistema de información hay normas o procedimientos a seguir para establecer la seguridad de la información de los datos de los pacientes.

32. El Sr. Gutiérrez Centeno declaró que las razones eran por la información de los pacientes era vital, porque había direcciones, seguro social el cual podría implicar multas para el hospital y eran violaciones a la Ley HIPAA.

33. El Sr. Gutiérrez Centeno admitió que las políticas y reglas establecidas en la institución era para la protección de datos y eran los users y los passwords.

34. El Sr. Gutiérrez Centeno admitió que en el sistema establecido para ejecución de trabajo se dependía de las prioridades.

35. El Sr. Gutiérrez Centeno declaró que las prioridades para los servicios de trabajo era lo que tiene que ver con los médicos-pacientes y las estaciones que estén funcionando para que pueda darse buen servicio al paciente.

36. El Sr. Gutiérrez Centeno admitió que si hay una persona que no es usuario autorizado con acceso para ver los expedientes médicos de pacientes, esto es una violación a la Ley HIPAA.

37. El Sr. Gutiérrez Centeno admitió que la aplicación de Meditech es la aplicación que debe estar instalada para tener acceso a la información de los pacientes.

38. El Sr. Gutiérrez Centeno admitió que el 11 de julio de 2022, recibió de Manejo de Información una solicitud de servicios para la creación de un servidor virtual para el uso de dos (2) contratistas del Departamento de Salud con el propósito de registrar las estadísticas de tumores de cáncer del departamento.

39. El Sr. Gutiérrez Centeno admitió que esos dos (2) contratistas independientes del Departamento de Salud tenían que entrar al servidor para tener acceso a Meditech.

40. El Sr. Gutiérrez Centeno declaró que no se acordaba si había instalado la doble autenticación al servidor.

41. El Sr. Gutiérrez Centeno admitió que instaló el SOFO Central al servidor de ASEM y que le colocó el password a tenor con las políticas del Hospital.

42. El Sr. Gutiérrez Centeno admitió que no se acordaba qué número de IP se le asignó al servidor de ASEM (Departamento de Salud).

43. El Sr. Gutiérrez Centeno admitió que no era buena práctica utilizar como password el nombre "almacén" y "password".

44. El Sr. Gutiérrez Centeno declaró que luego del ransomware de 2020, la persona responsable de supervisar la computadora que cumpliera con los requisitos mínimos de seguridad era el querellante, corregir los señalamientos de SIDIF y que no era una buena práctica ponerle el password "almacen".

45. El Sr. Gutiérrez Centeno declaró que los adiestramientos para el cyber security eran costosos, pero entendía que no era vital para desempeñar sus funciones.

46. El Sr. Gutiérrez Centeno admitió que, en el 2022 recibió unos asesoramientos porque el Hospital tenía unas compañías contratadas que lo asesoraban y que lo asistían en sus tareas técnicas.

47. El Sr. Gutiérrez Centeno admitió que al momento del despido llevaba cuatro (4) años trabajando en la posición de Gerente.

48. El Sr. Gutiérrez Centeno admitió que recibió adiestramientos sobre Firewall para proteger la red informática de la empresa.

49. El Sr. Gutiérrez Centeno admitió que como parte de sus funciones éste estaba encargado de ofrecer charlas sobre el uso y política del Departamento de Sistemas de Información para los empleados nuevos.

50. El Sr. Gutiérrez Centeno admitió que la CIO Louriel Cruz le ofreció adiestramientos en el manejo de Firewall, Nutanix y Rubrik.

51. El querellante admitió que recibió un adiestramiento el 10 de junio de 2022 de 2 a 4 horas que no recuerda, y de Rubrik fueron 4 horas de backup.

52. También recibió otros adiestramientos de 2 y 3 horas sobre los servidores virtuales por CP Corp., con otros empleados y el querellante.

53. El querellante declaró que recibió otro adiestramiento individual.

54. El querellante admitió que le dieron un adiestramiento que también su supervisado Jean Lugo y Giovani Velázquez de Programación cogieron dichos adiestramientos.

55. El querellante admitió que el servidor virtual objeto del intento del ransomware fue creado para dos contratistas del Departamento de Salud para que éstos pudieran entrar al servidor y pudiera a entrar al sistema de Meditech.

56. El Sr. Gutiérrez Centeno admitió que era un empleado exento y que estaba on-call y que eso incluye sábados y domingos.

57. El Sr. Gutiérrez Centeno admitió que el "Active Directory" no tiene nada que ver con el ransomware, que son dos cosas aparte.

58. El Sr. Gutiérrez Centeno admitió que el email que recibió el síndico el día del ransomware en agosto fue de Sofo Central.

59. Admite que no supervisa a Giovani Velázquez, Programador ni a Pedro Morales.

60. El Sr. Gutiérrez Centeno admitió que firmó la factura del "penetration test" con la compañía GM el 14 de septiembre de 2021.

61. El Sr. Gutiérrez Centeno admitió que, para el 19 de mayo de 2022, estaba haciendo gestiones para obtener un nuevo trabajo y remitió un resume.

62. El Sr. Gutiérrez Centeno admitió que recibió adiestramiento de CP Corp. para finales de junio y que el adiestramiento fue para todo el personal técnico del Ashford Hospital.

63. El Sr. Gutiérrez Centeno admitió que se le enseñó crear servidores nuevos.

64. El Sr. Gutiérrez Centeno admitió que se creó una máquina virtual para que pudieran utilizarla de referencia para practicar.

65. El Sr. Gutiérrez Centeno admitió que tiene conocimiento de la Política de Contraseña de 20 de junio de 2021, aprobado por el Lcdo. Domingo Cruz Vivaldi, Director Ejecutivo.

66. El Sr. Gutiérrez Centeno admitió que recibió todos los correos electrónicos para la implementación de la aplicación DUO, porque todo el mundo tenía que cumplir con esa aplicación en el Departamento de IT.

67. Admitió que recibió y firmó la Descripción de Deberes del Supervisor del Centro de Cómputos.

68. El Sr. Gutiérrez Centeno admitió que recibió la Descripción de Deberes de Coordinador del Centro de Cómputos, firmado el 20 de septiembre de 2004.

69. La Descripción de Deberes del puesto de Gerente de Sistemas y Comunicaciones firmado por él el 9 de marzo de 2020.

70. El Sr. Gutiérrez Centeno admitió que recibió la Descripción de Deberes del 4 de agosto de 2022, donde se le indica que es importante marcar en su

descripción de deberes que entiende qué realiza y pone sus iniciales. Que éste hizo estas anotaciones y deberes adicionales que los añadió a puño y letra.

71. El Sr. Gutiérrez Centeno admitió que esas funciones adicionales las estaba ejerciendo en ese momento.

72. El Sr. Gutiérrez Centeno admitió que todas las que marcó y las que incluyó a mano eran las funciones que hacía en aquel momento.

73. El Sr. Gutiérrez Centeno admitió que recibió dos políticas, una de acoso laboral y otra por el Reglamento de Disciplina que acusó recibo por escrito.

74. El Sr. Gutiérrez Centeno admitió que también acusó recibo de otro Reglamento de Disciplina el 19 de agosto de 2003, que puso iniciales en cada uno de los reglamentos al final.

75. El Sr. Gutiérrez Centeno admitió que presentó una carta de renuncia efectiva el 29 de septiembre de 2021, porque le presentaron una oferta de empleo.

76. El Sr. Gutiérrez Centeno reconoció la carta de la Sra. Irma Carrillo aceptándole la renuncia.

77. El Sr. Gutiérrez Centeno reconoció la carta firmada por él del 23 de septiembre de 2021, retirando su renuncia después de que fue aceptada por el Hospital.

78. El Sr. Gutiérrez Centeno admitió que el 23 de septiembre de 2021, retiró su renuncia después de aceptada y que lo que motivo su retiro fue el miedo de cambio de trabajo.

79. El Sr. Gutiérrez Centeno reconoció que el 14 de octubre de 2021, lo nombran Oficial de Seguridad e Información Privilegiada de Salud del Presbyterian Community Hospital.

80. El Sr. Gutiérrez Centeno declaró sobre la carta de despido que este firmó, que el despido fue por varios incidentes de seguridad.

81. Sobre el resume sometido por el querellante, de marzo de 1998 hasta octubre de 2022, admitió que todas sus habilidades fueron para buscar una posición de técnico de sistemas, LAN Administrator o Administrator PAC.

82. El Sr. Gutiérrez declaró que no estaba gestionando la plaza de Gerente de Sistemas y Comunicaciones, porque están pidiendo demasiados requisitos.

83. El Sr. Gutiérrez Centeno admitió que cada viernes se realizaba una reunión en la Oficina de IT, donde se discutía el plan de trabajo de cada persona.

84. El Sr. Gutiérrez Centeno admitió que se le remitió el Reglamento de Disciplina para conocimiento y lectura a todo el personal de IT.

85. El Sr. Gutiérrez Centeno admitió que en el "Active Directory" se encontraban escritos en la descripción de los passwords de los usuarios y de la compañía estaban en el active directory.

86. El Sr. Gutiérrez Centeno reconoció que él nunca ha asistido a una reunión de la Junta aunque lleva 24 años trabajando en el Hospital.

87. El Sr. Gutiérrez declaró que creó en julio de 2022 un servidor virtual nuevo.

88. El Sr. Gutiérrez declaró que un ransomware puede brindar de un servidor viejo a uno nuevo.

89. El Sr. Gutiérrez declaró que nunca solicitó adiestramiento por escrito porque no eran tan importantes para él.

90. El Sr. Gutiérrez se despidió luego de dos (2) investigaciones con los documentos anejados de los hallazgos y examinar el expediente de personal por la Sra. Irma Carrillo (referencia y énfasis omitidos).[10]

Por su parte, en su escrito de oposición, el señor Gutiérrez impugnó los hechos 3,5,7,8,10,15,17,22,23,29,34,40,44,48,80,88 y 89. De igual forma, negó, en parte, los hechos 12, y 28. En torno al hecho 90, no expresó posición alguna. Tras realizar un análisis minucioso del expediente del caso, los anejos, deposiciones y declaraciones juradas tanto de la solicitud de sentencia sumaria como los de la oposición, no encontramos la existencia de hechos materiales en controversia. Cónsono con lo anterior, colegimos que el señor Gutiérrez no logró controvertir de manera satisfactoria ninguno de los hechos propuestos por el Hospital. Por consiguiente, acogemos los hechos propuestos por el Apelado como hechos materiales incontrovertidos.

Resuelto lo anterior, corresponde entonces revisar *de novo* si el foro primario aplicó correctamente el derecho a la controversia. La cuestión litigiosa que está ante nuestra consideración es si el despido del señor Gutiérrez fue uno injustificado a tenor con la Ley Núm. 80. Es un hecho incontrovertido que el Apelante fue despedido luego de que se realizaran **dos (2) investigaciones**. Dichas investigaciones obedecieron a un referido que le hiciera la Directora de Recursos Humanos del Hospital, la señora Irma Carrillo Muñiz ("señora Carrillo") el 10 de octubre de 2022, como consecuencia de un incidente de seguridad del sistema de información de la empresa

---

[10] Véase, apéndice del recurso, págs. 5-16.

durante la semana del 6 al 14 de agosto de 2022.[11] La primera investigación identificó, entre otras cosas, que hubo varios accesos no autorizados al sistema de información. Además, se encontró que un servidor establecido por el señor Gutiérrez se había realizado sin tomarse las medidas de efectividad y realización de pruebas de seguridad necesarias. Asimismo, resultó de la investigación que el *Active Directory* en el área de descripción de usuarios sensitivos con acceso privilegiados, "se encontraban todos los passwords en cada uno de ellos escritos".[12] Esto último, a juicio de la señora Carrillo, constituía en una falta crasa y en violación a las políticas de la institución que prohíben escribir, guardar y compartir contraseñas en sitios accesible.

Cabe señalar que la primera investigación concluyó, el 10 de octubre de 2022. El mismo día que la señora Carrillo recibió el referido sobre el incidente de seguridad del sistema de información, se suscitó un segundo incidente en los sistemas de información del Hospital. El aludido incidente, estaba relacionado con un archivo corrupto que provenía de un evento de *ransomware* ocurrido previamente en el Hospital. Así las cosas, se rindió un informe final del caso del señor Gutiérrez producto de las investigaciones realizadas a raíz de los eventos antes mencionados. Conforme se desprende de la declaración jurada de la señora Carrillo, surge lo siguiente:

21. En este procedimiento se evaluó el hecho de que fueron múltiples incidentes por el Sr. Gutiérrez. Debido a la sensibilidad de los incidentes, el riesgo a la información protegida de salud y de la operación del Hospital, nos vimos en la obligación de despedirlo por múltiples violaciones a Reglas del Reglamento de Disciplina que dispone el despido inmediato. El Sr. Gutiérrez no se despidió por el intento de "ransomware" del 14 de agosto de 2022. Su despido fue motivado por no monitorear el sistema y no cumplir con las políticas del Departamento de Sistemas de Comunicación para prevenir dicha situación y exponer información de pacientes y del

---

[11] Véase la declaración jurada de la señora Carrillo, apéndice del recurso, págs. 554-559.
[12] *Íd.*, pág. 556.

Hospital que pudo acarrear multas y reclamaciones legales.

22 El Sr. Gutiérrez violentó la regla 80 entre otras del Reglamento de Disciplinario tomar las debidas precauciones para proteger la información, la información protegida de salud contra el acceso ilegal y no autorizado, uso modificado y divulgación o destrucción de forma inapropiada, dejar intencionalmente trabajo acumulado, tareas atrasadas que afecten adversamente la operación del Hospital, ocultar hechos, tergiversar datos, hacer declaración falsa sobre incidentes ocurridos en el Hospital, compartir contraseñas o dejar contraseñas activas para uso de otros compañeros o guardarlas donde pueda ser accesada por personas no autorizadas y otros, crear una severidad de situación y riesgo a la seguridad de información protegida de salud, por lo que el Hospital, a través del Departamento de la suscribiente nos vimos en la obligación de suspender las funciones y darle terminación al Sr. Miguel Elías Gutiérrez Centeno como empleado del Hospital.[13]

Es un hecho incontrovertido que el señor Gutiérrez tenía conocimiento del *Reglamento de Disciplina*.[14] Asimismo, se le imputó al Apelante, faltas proveniente de dicho reglamento que daban lugar a despido por primera ofensa.[15] En ese sentido, nuestro ordenamiento jurídico reconoce que un despido como sanción por primera falta podría ser justificado si el acto o la falta que da pie al despido es "de tal seriedad o naturaleza que revele una actitud o un detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa". *González Santiago v. Baxter Healthcare, supra*, pág. 292.

Ahora bien, en cuanto a lo constituye un despido justificado, la Ley Núm. 80 no provee una definición exacta de dicho concepto. No obstante, "el estatuto expone de forma ilustrativa ciertas instancias en las que se justifica el despido de un empleado por parte del patrono." *Ortiz Ortiz v. Medtronic, supra*, págs. 771- 772. Uno de estos supuestos, es cuando el empleado "**no ha cumplido con sus labores de manera eficiente, ha realizado tarde o**

---

[13] *Íd.*, pág. 556.

[14] Véase el hecho propuesto número 73. Véase, además, apéndice del recurso, págs. 258-272. En cuanto al conocimiento que tenía el señor Gutiérrez referente al *Reglamento de Disciplina*, Véase la deposición que se le tomó al Apelante el 7 de junio de 2023, apéndice del recurso, pág. 175, lineas1-18, Véase además el acuse de recibo de dicho documento *Íd.*, pág. 257.

[15] En particular, la declaración jurada de la señora Carrillo imputó que el Apelante violó la Regla 80 de Reglamento de diciplina la cual, dispone como sanción el despido como primera ofensa. Véase apéndice del recurso, pág. 265.

**negligentemente su trabajo, o en violación a las normas aplicables"**, Véase, Art. 2 de la Ley Núm. 80, 29 LPRA sec. 185b(b) A fin de cuentas, la Ley Núm. 80 aclara que "**no se entenderá por justa causa aquel despido que se haga por capricho del patrono o sin razón vinculada con el buen y normal funcionamiento del establecimiento**" (Énfasis suplido). Art. 2 de la Ley Núm. 80, *supra. Ortiz Ortiz v. Medtronic, supra.*

Conforme a la amplia prueba que obra en el expediente, el señor Gutiérrez no monitoreó el sistema de información del Hospital y no cumplió con las políticas del Departamento de Sistema de Comunicación. En concreto el *Informe Final Actualizado del caso del Miguel Gutiérrez* preparado por la Principal Oficial de Informática, la señora Louriel Cruz concluyó lo siguiente:

> En resumen, se inspeccionaron todos los servidores en la red. Se identificó que la doble autenticación para el servidor creado por el Sr. Gutiérrez no fue instalado. Las contraseñas utilizadas, no cumplían con las políticas de seguridad establecidas. El doble autenticador DUO, no fue activado para el Administrador local. Se detectó que el Directorio Activo no está debidamente configurado y no estaba aplicando las medidas de seguridad a todas las máquinas. Se determinó que el servidor no cumple con los estándares de instalación del departamento. Asimismo, no se siguieron las instrucciones impartidas al momento de la creación del servidor "Accessmedite". Se violaron las políticas de seguridad del (PHI), procedimiento de instalación y configuración de los equipos por parte del Sr. Miguel Gutiérrez.[16]

Consecuentemente, el Hospital determinó que el señor Gutiérrez puso en riesgo la seguridad de información sensitiva de salud que estaba protegida ya que entre estos, se encontraba datos de los pacientes del Hospital. Ello, sumado al incumplimiento de varias normas de conducta, la cuales son claras, dieron lugar a su despido.[17]

---

[16] *Íd.*, págs. 361-362.

[17] En cuanto a las violaciones disciplinarias, el *Informe Final Actualizado del caso del Miguel Gutiérrez* revela lo siguiente:

> Regla (s) Disciplinaria(s) que violó el Sr. Gutiérrez:(80) No tomar las debidas precauciones para proteger la información protegida de salud (IPS) contra el acceso ilegal o no autorizado, uso, modificación, divulgación o destrucción de forma inapropiada. (65) Detener el funcionamiento normal de cualquier departamento del

Por ende, al Apelante no poder demostrar que el Apelado actuó de manera arbitraria y caprichosa al despedirlo como consecuencia de sus faltas, constatadas luego de haberse efectuado las investigaciones, resolvemos que el despido del señor Gutiérrez fue justificado. Por consiguiente, el error imputado al foro primario no se cometió y consecuentemente, no hallamos razón que justifique nuestra intervención con la decisión del foro primario a la cual se le atribuye una presunción de corrección.

**IV.**

Por los fundamentos antes expuestos, **confirmamos** la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones

---

Hospital. (78) Dejar intencionalmente trabajo acumulado o tareas atrasadas, que afecten adversamente la operación del Hospital. (70) Insubordinación a un supervisor(a), incluye la negativa a hacer un trabajo u obedecer órdenes escritas o verbales, a menos que sea por condición legítima de seguridad. (59) Ocultar hechos, tergiversar datos o hacer declaraciones falsas sobre incidentes ocurrido en el hospital o relacionados al mismo. (58) Compartir Contraseñas, dejar contraseñas activas para el uso de otro compañero y/o guardar contraseñas donde puedan ser por otras personas no autorizadas. (19) Ineficiencia/Incumplimiento en el desempeño de sus funciones conforme a las normas, procedimientos, descripción de funciones, volumen de trabajo, instrucciones operacionales y otros establecidos para garantizar la calidad del trabajo que se desempeña en el Hospital. (16) Falta de interés o negligencia en el desempeño de sus deberes. (17) Mala utilización de herramientas, equipo y material del Hospital.